Condenser Service & Engineering Co., Inc. v. Commissioner.
Condenser Serv. & Eng'g Co. v. Commissioner
Docket No. 18787.
United States Tax Court
1951 Tax Ct. Memo LEXIS 98; 10 T.C.M. (CCH) 911; T.C.M. (RIA) 51280; September 20, 1951
*98 Murray M. Weinstein, Esq., 60 Park Pl., Newark, N.J., and Samuel J. Warms, Esq., for the petitioner. Francis X. Gallagher, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves a deficiency of $103,837.55 in excess profits tax for the calendar year 1942. Issues conceded by the respondent at the hearing will be reflected in the recomputation under Rule 50. The issues remaining are whether petitioner is entitled to deduct as ordinary and necessary business expenses the amount of $97,500 incurred in settlement of a court proceeding and expenses totaling $26,707.77 incurred in connection therewith. The facts set forth in a stipulation are found as agreed to therein, and are set forth so far as considered necessary in our Findings of Fact The petitioner, a New Jersey corporation organized in September 1928, kept its books and filed its returns on an accrual basis. Its income tax returns for the taxable year were filed with the collector for the fifth district of New Jersey. The business of petitioner until about 1934 consisted of maintaining steam condensers. It then began to design and manufacture condensers *99 and heat exchangers. During 1938 it carried out contracts with municipalities for expansions of power plant facilities. The business of petitioner decreased considerably upon the completion of that work and did not increase a great deal until the latter part of 1939 when petitioner obtained some contracts in connection with the preparedness program of the Federal Government. In April 1941 it obtained a contract from the Navy Department in the amount of $2,241,000 for the manufacture of ammunition hoists. Thereafter petitioner, instead of finding it difficult to obtain contracts for work, had difficulty refusing to accept contracts. Part of the contract price for the Navy job was advanced to petitioner. The office space was increased the latter part of 1940 or the spring of 1941. There was a large increase of office and plant personnel from 1939 to September 1941. In January 1941 petitioner purchased a plant in Scranton, Pennsylvania, which had about 20,000 square feet of space. In May 1941 petitioner exchanged its preferred stock for common stock of the Pottsville Castings and Machine Shop, Inc., Pottsville, Pennsylvania, which had 200,000 square feet of plant facilities. Immediately *100 prior to March 18, 1939, 60 per cent of the capital stock of petitioner was held by William M. Kennedy, president and general manager of petitioner, and the remainder by Severin F. Blain, secretary of petitioner. During 1939 Howard C. Evans was treasurer of petitioner and since 1940 he has been vice-president thereof. In 1939, in addition to being secretary, Blain supervised repair and maintenance work in the field. The duties required him to spend most of his time away from petitioner's plant. He continued to perform the supervisory work until his death on October 20, 1946. Blain worked at the plant of petitioner when not engaged at work in the field. Between March 1939 and September 1941 he had opportunity to observe that Kennedy was performing services in the offices of petitioner. On March 18, 1939, petitioner and Blain executed an agreement by the terms of which Blain agreed to sell to petitioner all of his stock of petitioner, consisting of 1,250 shares, all of his stock in Instrument Service Co., Inc., and cancel indebtedness of petitioner to him, for the total amount of $40,000, payable at the rate of $100 a week, with a right in petitioner to anticipate or increase the *101 payments. Fifty shares of petitioner's stock were to be delivered under the agreement for each $1,600 of weekly or other payments. The stock of the Instrument Service Co., Inc., was to be delivered when $5,200 had been paid under the agreement. The agreement provided for the continued employment of Blain so long as petitioner desired his services, and contained an agreement of Blain not to divulge the contents of the contract. Blank spaces appeared in the instrument for inserting the portion of the total amount paid for the stock and the discharge of the indebtedness, but they were never filled in. The first 31 checks, each for $100, issued to Blain under the agreement were not accepted until October 31, 1939, after which they were deposited in his bank account. Thereafter petitioner issued 97 checks, at the rate of one check of $100 for each week, which were deposited by Blain's daughter in his bank account. The last of the 97 checks was issued on September 6, 1941, which was deposited after Blain and his counsel had determined to institute a proceeding in Chancery to rescind the contract of March 18, 1939. Except during a conference held in October 1939, Blain did not at *102 any time through September 12, 1941, discuss the contract with Evans. By subpoena dated September 12, 1941, Blain instituted an action in Chancery in New Jersey against petitioner, Instrument Service Co., Inc., Metals, Inc., Molten Metallizing Corporation, Blackburn Smith Manufacturing Co., Inc., and Pottsville Casting & Machine Shop, Inc., and Kennedy and Evans, individually and as partners trading under the firm names of Specialties Engineering & Service Co., American Ball Engine, Bushnell Press and Molten Metal Spray Co.; also a separate action against Evans, individually. The complaint alleged, among other things, that the individual defendants fradulently appropriated to themselves profits and assets of the corporations; that Kennedy falsely represented that profits of the business were being invested in the business; that Evans' association with petitioner was conceived and continued for the purpose of cheating and defrauding the complainant, petitioner and the Instrument Service Co., Inc., and to induce him to sell his stock for a price grossly out of proportion to its true value; that about January 1939 Kennedy informed the complainant that there might be an opportunity *103 to sell the business of petitioner for $100,000; that on March 18, 1939, Evans and Kennedy informed the complainant that the business was about to be sold to Harriman Brothers, a banking firm which owned the Cramp Shipbuilding Corporation, and presented to him for signature a contract of sale, which had been prepared by Evans, and submitted a like form of contract for execution by Kennedy; that inasmuch as the real purchaser did not wish it to become known that it was acquiring the stock, petitioner's name was inserted in the contract as the purchaser thereof; that Evans urged him to sign the agreement; that immediately after Evans had explained the provisions of the contract to complainant, without reading them to him, Kennedy executed the form of contract prepared for the sale of his stock, and complainant, believing the assurances given him by Kennedy and Evans, executed the instrument prepared for his signature; that when signing the contract complainant did not know and was not informed by Kennedy or Evans that the weekly payments were also to be considered in settlement of indebtedness of petitioner to him, which amount he did not know to be in excess of $40,000; that about June *104 1939 one Jacocks became an employee of petitioner and promptly thereafter Kennedy and Evans informed complainant that Jacocks was a representative of Harriman Brothers and was present to carry out the contract of sale; that Kennedy had already delivered his stock and that the failure of complainant to do likewise was delaying the consummation of the transaction; that thereafter Kennedy repeatedly informed complainant that he had completed his part of the transaction; that in October 1939 Evans assured the complainant and his daughter that he had exercised his best efforts in obtaining the highest possible price for the stock and in fact complainant was receiving more than its worth, as proof of which he produced a balance sheet of petitioner's showing that it had a net worth of $69,260, and informed them that Kennedy had executed a like contract for the sale of his stock; that early in 1940 Evans advised complainant that the weekly payments being made to him under the contract should be reported for tax purposes as salary; that payments being made to the complainant were being entered in the books of petitioner as salary; that the stock was not being carried on the books of petitioner *105 as an asset and the unpaid purchase price was not entered in the books as a liability; that in February 1941 Jacocks informed complainant that Kennedy and Evans had requested him to inform complainant that he was a representative of Harriman Brothers and to urge complainant to deliver his stock to petitioner; that the true facts in respect to the net worth of petitioner were fraudulenly withheld from the complainant in order to induce him to dispose of his stock for $40,000; that other frauds were committed by petitioner, Instrument Service Co., Inc., and Kennedy and Evans as set forth in the complaint; that certain fraudulent acts to the detriment of the complaint were committed by Kennedy and Evans in the organization and operation of Metals, Inc., a New Jersey corporation; the Molten Metallizing Corporation, a New Jersey corporation; the enterprises known as American Ball Engine, Bushnell Press, and Specialties Engineering & Service Co.; Blackburn Smith Manufacturing Co., Inc., a New York corporation; and Pottsville Casting & Machine Shop, Inc., a Pennsylvania corporation; and that at the time Kennedy and Evans represented to the complainant that Kennedy and the complainant were *106 selling their stock in petitioner and the Instrument Service Co., Inc., for $100,000, Kennedy and Evans were attempting to negotiate with the Cramp Shipbuilding Corporation or Harriman Brothers for the sale of the business of the two corporations for $1,000,000. The allegations were repeated in the complaint as a separate and distinct cause of action against Evans. The complainant prayed in his complaint, among other things, that the agreement of March 18, 1939, be decreed to have been procured by fraud and misrepresentation and that it be set aside; that the shares of stock of petitioner and the Instrument Service Co., Inc., be returned to him as the legal owner thereof; that the complainant be restored to his position as secretary and director of petitioner; that the complainant have discovery and inspection of all of the books and records of all of the defendants and that they be directed to permit examination thereof; that an accounting be taken of all the profits received by the defendants and the losses sustained by the complainant, petitioner and the Instrument Service Co., Inc.; that the assets of the defendants be enjoined with a trust for the benefit of petitioner and *107 the Instrument Service Co., Inc.; that the defendants, excluding petitioner and Instrument Service Co., Inc., be ordered to pay to the excepted corporations all profits made by them through their acts as alleged in the complaint, together with any amounts found to have been lost; that petitioner and Instrument Service Co., Inc., be ordered to account to the complainant for all of the debts found to be due the complainant; that Kennedy and Evans, individually and as partners, be ordered to account for all salaries, bonuses, emoluments and other gain received by them from all of the other defendants; that, pending the suit, the court impound in the custody of an officer, designated by it, all of the books and records of the defendants as evidence for the benefit and protection of the parties in interest; that, during the pendency of the suit, the defendants be restrained from paying out any money, except in the ordinary course of business; that a receiver be appointed for all of the corporations, firms and partnerships named as defendants to manage the businesses pending the final outcome of the suit; that Kennedy and Evans be removed as officers and directors of the corporate defendants; *108 and that Evans account to the complainant for all acts performed by him on behalf of the complainant under a power of attorney executed March 26, 1931. The American Ball Engine, Bushnell Press, Molten Metallizing Corporation, Blackburn Smith Manufacturing Co., and Pottsville Casting & Machine Shop, Inc., were affiliates of petitioner. The Specialties Engineering & Service Co. was a trade name used by petitioner to market a product produced under a patent not owned by it. The answer of the defendants, filed not later than October 31, 1941, denied all of the material allegations of the complaint and prayed that the complaint be dismissed upon grounds which included affirmance of the contract of March 18, 1939, after discovery of the alleged fraud. Lengthy affidavits of Evans and Kennedy and affidavits of other individuals, all of which were executed by the affiants in October 1941, were filed with the court in pursuance of an order made by it on October 31, 1941. After considering the affidavits filed by the respective parties to the suit, and having cross-examination of some of the affiants, including Evans, Kennedy, Adolph Morby, who had been in charge of the accounting department *109 of petitioner since 1935, and O. Anderson, an employee of petitioner, and the merits of the allegation of the affirmance of the contract, and argument of counsel, the court on November 27, 1941, ordered the defendants, among other things, to refrain from destroying or making any entry in its books other than in the ordinary course of business; paying out any money other than in the ordinary course of business; issuing any checks without supporting papers; paying other than normal salaries to officers and employees and any amounts on accrued salaries other than appearing on the books; holding directors' or stockholders' meetings of petitioner and the Instrument Service Co., Inc.; transferring any shares of stock and keep an accurate itemized account of income and expenses. The order also gave the complainant permission until December 15, 1941, to inspect the books of the defendants, except Evans and Kennedy; restrained Evans from exercising any powers under the alleged power of attorney given him by Blain and denied the application of the complainant for a custodial receiver. On April 24, 1942, the court in an ex parte proceeding appointed a receiver pendente lite to take over the *110 property and operate the business of the defendants in the litigation. The receiver was discharged on May 1, 1942. The order of the court directed that his fees be paid by the petitioner. The filing of the complaint, some of the allegations made therein, including the charges of fraud and misrepresentation, and the appointment of a receiver were given publicity in newspapers published in Jersey City and New York City. The appointment of a receiver was mentioned in a radio broadcast. The suit and appointment of a receiver was published by Dun & Bradstreet, Inc., in notices to its subscribers. As a result of the filing of the suit and appointment of a receiver, Evans and Kennedy were compelled to devote considerable time answering inquires from creditors and preparing affidavits for use in the litigation and assisting counsel to conduct a defense. Their affidavits were signed by them in October 1941. Officers of the three largest creditors of petitioner and the Pottsville Casting & Machine Shop, Inc., to which they were indebted for amounts in excess of $200,000 assured Evans after September 11, or in October 1941, that they would not press their claims in a greater extent than theretofore, *111 on the ground that they were relying upon the management of A. Kennedy and to some extent on that of Evans. The principal creditors of petitioner were the Bridgeport Brass Co. and Revere Copper & Brass, Inc., in that order. The Bridgeport Brass Co. did not change its credit rating of petitioner after the complaint was filed but gave closer attention to the account. Petitioner had a slow type of account with Revere Copper & Brass, Inc., for many years. In the fall of 1941 the account ranged from $40,000 to $50,000 and petitioner was taking from 60 to 90 days to pay. About October 8, 1941, the limit was reduced to about $25,000. The account from about November 1, 1941, to January or February 1942 ranged from $10,000 to $15,000, during which period petitioner generally discounted the bills. The credit limit thereafter to the time of appointment of the receiver was $15,000. After the litigation was settled Revere Copper & Brass, Inc., was willing to give petitioner a substantial amount of credit. At that time petitioner was discounting the bills of Revere Copper & Brass, Inc. Both creditors stopped shipments to petitioner when the receiver was appointed but resumed them as soon as he was *112 discharged. After the receiver was discharged Revere Copper & Brass, Inc., restored the credit of petitioner to $15,000. After a settlement of the suit in July 1942 Revere Copper & Brass, Inc., was willing to extend liberal credit on long terms. Thereafter petitioner discounted its bills. Petitioner advised creditors by circular letter in October 1941 that the litigation was not interfering with the regular operation of its business. About April 24, 1942, the Navy Department notified petitioner that on account of delay in delivery consideration was being given to the cancellation of the contract for producing ammunition hoists and the transfer of the work to a Government plant. On April 28, 1942, Kennedy, the receiver, and counsel discussed the matter with an officer of the Navy Department in Washington. Blain engaged an accountant to examine the books and records of petitioner and other defendants in the litigation. The examination of the accountant and his assistants extended over a period of about three months during the course of which they investigated the records of petitioner, Instrument Service Co., Inc., Blackburn Smith Manufacturing Co., Inc. Metals, Inc., Molten Metallizing *113 Corporation, and Specialties Engineering & Service Co., Inc. They did not examine the books and accounts of the Pottsville Casting & Machine Shop, Inc. The accounting department of petitioner could not keep its work current during the course of the investigation. The accountant reported on January 7, 1942, that the books of petitioner as of September 30, 1941, disclosed that it owed Blain $42,477.34 for commissions and salary accrued during the years 1929 to 1932, inclusive, and 1935, 1936 and 1939, and that the amounts were entered in the books by charges to commissions paid and credits to accounts payable; that the net worth of petitioner and its affiliates as of December 31, 1938, was $268,356.90, without reflecting $161,492.94 for improper withdrawals and expenditures of corporate funds, for which Kennedy and Evans should make an accounting, and that there should be restored to profits for years to and including 1940 the amount of $477,968.91. The report of the accountant was filed with the Chancery Court. Evans, Kennedy and counsel employed to represent the defendants in the proceeding were of the opinion that the defendants could win the case, based in part upon a belief *114 the complainant had accepted benefits of the contract of March 18, 1939, after the fraud alleged in his complaint had been ascertained. Petitioner's tax consultant and others advised its officers that as costs and expenses of the litigation were deductible as ordinary and necessary business expenses, settlement would not be too costly to petitioner. In November 1941 the court denied a motion of the defendants to dismiss the complaint because of acceptance of benefits of the contract after discovery of the alleged fraud. Kennedy was opposed to a settlement of the litigation. In December 1941 an unsuccessful attempt was made to compromise the suit. After the accountant employed by Blain had completed his examination, a special agent of the Bureau of Internal Revenue examined the books of petitioner for the years 1929 to 1941, inclusive. No fraud penalties were asserted as a result of the examination and items questioned by the special agent were adjusted in conference. While the suit was pending, an undisclosed number of petitioner's important employees resigned because of the unfavorable publicity given the action. Considerable time elapsed before petitioner was able to make satisfactory *115 replacements. During that period a bank denied petitioner's application for a loan. Testimony was taken by the court in the suit at hearings held for a total of six days in May and June 1942. After the complainant rested his case, Kennedy testified as the first witness for the defendants during the afternoon of June 24, but his direct examination was not completed that day. During the course of the examination of Kennedy, the court announced that if the parties could not complete the hearing the next day, the case would be adjourned until the next fall. It would have taken about ten days to submit all of the evidence the defendants had to offer, which, under the practice prevailing in the chancery courts in New Jersey to hold hearings in a case for no more than three or four days during any one month, might have prolonged the completion of the case until 1943. After the conclusion of the session of the court on June 24, 1942, the defendants, on the recommendation of counsel and petitioner's accountant, decided to make a determined effort to settle the proceeding by compromise. The conclusion was based in part upon the record made by the complaint at the hearing. The recommendation *116 of counsel and the accountant was based in part upon the deductibility of any amount paid in settlement as an ordinary and necessary business expense. Counsel for the complaint advised him not to settle the suit. Negotiations by the parties and their counsel resulted in a settlement on July 23, 1942, by the terms of which Blain agreed to dismiss the complaint in consideration of the payment to him by petitioner of $97,500, payable $80,000 in cash upon the signing of the agreement, $8,500 on August 1, 1943, and $9,000 on August 1, 1944. The settlement confirmed in all respects the agreement of March 18, 1939. At the insistence of Evans and Kennedy, and contrary to the judgment of his counsel, the complainant on July 23, 1942, signed a statement in which he retracted and withdrew all of the allegations of his complaint and stated that the retraction was fully justified by investigations made at his request after the complaint was filed. Petitioner reported net income of $259,733.06 in 1940, $494,813.34 in 1941 and $686,518.82 in 1942. During 1942 petitioner paid the amount of $3,558.18 to the receiver for services rendered by him, the amount of $22,139.59 to attorneys for services *117 rendered in connection with the litigation, and $1,010 to a reporter for transcripts of testimony taken at the hearing. The amounts, together with the amount of $97,500 paid and accrued under the settlement agreement, were claimed as deductions from gross income in petitioner's return for 1942 and respondent disallowed the deductions upon the ground that they were not ordinary and necessary business expenses. Opinion It is well settled that amounts expended to protect or to promote the business of a taxpayer are deductible as ordinary and necessary business expense and that expenditures incurred in defending, protecting or perfecting title to property constitute capital charges, and, therefore, non-deductible expenses of doing business. Petitioner does not question the controlling rule. Petitioner argues that even though the litigation relates to title to a capital asset, the expenses thereof are nevertheless deductible if the taxpayer is convinced that the claimant has "relatively little chance of succeeding" and makes the payment to avoid damages from the litigation. It says that under such circumstances the payment is not made to perfect title, but to get rid of the harmful *118 effects of the suit so as to place the taxpayer in a position to produce income. It argues that Blain's complaint inflicted and if continued would have caused additional damages upon its credit and business in general and made the settlement for no purpose other than to eliminate that condition. Petitioner asserts that the facts here meet the tests set forth in . That case, as petitioner concedes and respondent does not deny, recognizes the rule governing the issue here. There the court found fault with the application of the statute and remanded the case to this Court for further proceedings to make findings on three questions. There, the court of appeals said that: "* * * it is clearly a mistake to take the face of the claim as a test of whether a payment is a cost of defending a title. If the payment is to be reckoned as such, it must be in fact made for the purpose of relieving the property of some lien or other hostile interest. The mere fact that, if it were sound in law, it would establish such an interest, does not prove that the taxpayer has paid to defend his title; he may be completely confident that this is *119 not peril; yet there may be other sound reasons for ridding himself of the suit. The cost of the mere contest may be more than the claimant is willing to accept; the mere pendency of the suit may disastrously affect the taxpayer's general credit. * * * In the case at bar, if the Levitts were altogether satisfied with their lawyer's advice about Edelman's claim, if they settled with him only because they feared the effect of the publicity upon their credit, and so upon their business generally, the payment was not part of the cost of any of their property; though, whether it was an 'ordinary and necessary' expense of the business, is another matter." The court of appeals recognized that the payment was an "ordinary" expense, and whether it was necessary depended upon questions which this Court did not pass. It said further that: "* * * If in the case at bar the Levitts were right in [1] thinking that Edelman's suit would be likely to have those effects upon its credit which they expected, that was enough; 'necessary' in this connection only means necessary, if reasonable expectation proves well grounded. * * * *120 The case was remanded for findings for three questions as to (1) whether the taxpayer was entirely confident that any suit brought could not succeed; (2) whether the payment was made for the sole purpose of avoiding damage to its credit, reputation and business generally; and (3) whether the fear was such that a reasonable person would have believed a settlement at the amount made would be less than the damage from a suit. On remand the first two questions were answered in the negative and the evidence was not sufficient to make a finding on the third question. . On appeal the circuit court said that: "The findings now make it clear that the so-called expenses were at least to the extent of an undisclosed part a payment made to perfect the title to the property." and therefore the payment should be treated as a capital outlay, which rendered it impossible to conclude as a matter of law that the amount was an ordinary and necessary business expense. . Petitioner conceds that Blain's complaint, on its face, was a cloud on its title in the stock and that there is little doubt that the payment would be a capital expenditure *121 had the claim of Blain been bona fide and meritorious. It then asserts that the payment was not made to remove or dispel a could on its title but for the purpose of getting rid of the damage the litigation was causing to its business. Petitioner interprets the court's opinion to mean that for an expenditure in defense of title to be a capital outlay it must have been made to remove some "actual cloud from the title." The court did not go that far. It said no more than that the expenditure to be a cost of defending title must have been, in fact, paid to relieve the property of some lien or hostile interest. A payment might be a capital outlay even though the claim to title lacked merit or was illegal. . Payments made in compromise of attacks on title to property are capital expenditures. , where fraud was alleged and rescission of the contract of sale was prayed for, as here; . Any amount paid to Blain as additional selling price of his stock would *122 be regarded as proceeds of sale of a capital asset. . In , the Court said that: "* * * the distinction sought to be made between acquisition through such a judgment and acquisition by a compromise agreement in lieu of such a judgment, is too formal to be sound * * *." The complaint filed by Blain, excluding the separate cause of action against Evans, alleged that the sale of the stock to petitioner was induced by fraudulent misrepresentations, and otherwise to the effect that the actions of the defendants had defrauded him as a stockholder of petitioner and the Instrument Service Co., Inc. Blain asked for a rescission of the contract of sale and an accounting. The action was a direct attack upon petitioner's title in and ownership of the stock. Had the proceeding gone to judgment in favor of the complainant, petitioner would have lost its alleged interest in the stock. Then, as the parties agree, the proceeding would have become a stockholder's derivative action for the benefit of Blain. After Blain rested his case and the defendants had submitted some testimony of Kennedy, the defense concluded *123 to endeavor to compromise the action with Blain, in which they were successful, and under which, for $97,500 payable by petitioner alone, Blain agreed to dismiss the action against all of the defendants and ratify the contract of sale. The settlement freed petitioner of the cloud the complaint had cast upon its title to the stock and all of the defendants of liability to Blain for an accounting. The evidence does not disclose the manner in which the parties arrived at the settlement figure of $97,500. If it was made for the sole purpose contended by petitioner, the method is immaterial. But under the case relied upon by it, the amount of the compromise is a factor to be considered. The attorneys employed by petitioner to defend the complaint felt, according to testimony, that the suit would result in a decision for the defendants if the proceedings continued to a decision after a full hearing and expressed their confidence to petitioner's officers and accountant. Opposed to such testimony is the fact that after the complainant had rested, and before Kennedy, the first witness for the defense, had completed his testimony, a decision was made by the defendants to endeavor to compromise *124 the litigation. Counsel for Blain urged him not to settle and testified that if he had had an opportunity to cross-examine Kennedy, there would not have been a settlement. In addition, reduction of the amount paid by tax savings from deduction of the settlement payment was a factor. The accountant estimated and advised Evans, Kennedy and counsel, that the deduction would result in a recovery of about 75 per cent of the payment in settlement. Damage to the business of petitioner, and further damage if the trial was continued into the fall and later, was stressed in the testimony as a factor considered when the decision was made to effect a compromise. The litigation received some publicity and the defense of the complaint caused some interruption to the normal administrative activities of petitioner's chief officers, particularly for about one and a half months while the answer to the complaint and their affidavits were being prepared, and office routine, but the evidence fails to establish that the litigation caused any damage to petitioner's business generally through loss of credit or otherwise. Creditors communicated with petitioner's officers in regard to the effect, if any, *125 the litigation would have on their accounts. Reaction of that sort is not regarded as unusual. The reaction of petitioner's largest creditor was no more than to keep a closer watch on the account. The next largest creditor reduced the maximum amount of credit and as to it petitioner maintained a discount basis at least part of the time. Both stopped shipments for about one week while petitioner was in receivership. No proof was made that any of petitioner's other creditors altered the credit status of petitioner in any way. It does not appear from the evidence that petitioner had to curtatil production at any time on account of lack of material due to loss of credit caused by the litigation, including the receivership. The Navy Department threatened to cancel its contract on account of failure to deliver on schedule, but the evidence does not disclose that the threat resulted from the litigation, or that the contract was canceled at any time material here. Evans testified that after acquiring the contract from the Navy Department, "work from that time on, instead of being hard to get, was hard to refuse." The testimony shows that the suit did not in any way affect the ability of *126 petitioner to obtain as many orders as it could fill. Other evidence that the suit did not affect the actual normal operation of petitioner during the midst of the preparation of an answer to the complaint and supporting affidavits of Evans and Kennedy is the following statement made by Kennedy on October 8, 1941, with respect to the suit in a letter to creditors: "* * * It in no way interferes with our regular operation of the business in its ordinary course and was considered by us of so little importance as to render it unnecessary to do anything in connection therewith. Our business is being operated as usual by its regular management." The net income of petitioner increased from about $260,000 in 1940, the year before the complaint was filed, to about $495,000 in 1941 and about $685,000 in 1942. These increases disclose progress in earnings in spite of the alleged harmful effect of the litigation. Not only are we unable to find from the evidence that petitioner was entirely confident that it could win the suit and that the settlement was made for the sole purpose of preventing damage to its business, but with no evidence on the point no proof was made that any damages sustained *127 and to be sustained, exceeded the settlement figure. A judicial determination in favor of petitioner on the sale question would have relieved it of any liability for an accounting. Title to the stock was, in our opinion, the primary purpose of the suit. The defense was made to establish ownership in petitioner and the legal fees and other expenses of litigating the issue were incurred in defending and protecting that title. A judgment in favor of Blain would have subjected petitioner to liability for payment of the accruals for commissions and bonuses in the amount of about $42,000. Any amount paid in settlement of that asserted liability would not be deductible as a business expense, which petitioner concedes. It is apparent from the record before us that at least some part of the compromise payment was made and legal fees and other expenses were incurred in defense of title, and, therefore, a capital expenditure. We can not conclude that any amount was paid or incurred for any other purpose. There are other reasons for disallowing the lump sum payment and legal expenses as deductions. The complaint of Blain made subsidiaries of petitioner and Evans and Kennedy, individually, *128 defendants, in addition to petitioner. Aside from the stock transaction, all of the defendants were charged with acts against the interest of the complainant as a stockholder. The complaint contained a count as a separate action against Evans, under which Blain asked for an accounting for acts of the defendant in carrying out a power of attorney given to him in 1931. Dismissal of the action against all of the defendants resulted from the lump sum payment. Without evidence on the point we are in no position to say that some part of the amount was not paid to free defendants, other than petitioner, of the charges made and potential liability thereunder. Payment of liability of other taxpayers is not ordinary and from the evidence here we can not say that it was necessary. ; ; ; . We find no error in the action of the respondent in denying the deductions claimed. Decision will be entered under Rule 50. Footnotes
1. "Greatly feared publicity, curtailment of credit, filing of liens and such."↩